## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MARGARET T. GIVENS, on behalf of herself, )<br>and all others similarly situated (together the )<br>the Plaintiff Class) )<br>                         Plaintiffs, )<br>v. )<br>)<br>Vanguard Industries, Inc.; Vanguard Plastics, Inc. )<br>Vanguard Piping Systems, Inc., Viega, Inc., )<br>Viega, LLC, Viega NA, LLC, VG Pipe, LLC, )<br>Mitsui Plastics, Inc.; Mitsui& Co. (USA), Inc.; )<br>Mitsui Petrochemical Industries, Ltd.; and )<br>Mitsui Sekka. )<br>                       Defendants, ) | Case No. <u>10-CV-2303 JTM/DJW</u> |

## COMPLAINT — CLASS ACTION

Plaintiff brings this class action against Defendants (individually and collectively, jointly and severally, "Defendants") for damages Plaintiff and the classes incurred or will incur for defective water piping installed in residences throughout the United States, and for Defendants' conspiracy, including the creation of new corporate entities, the transfer of assets for less than fair market value, and the sale of assets to third-party corporations, to render Vanguard Plastics, Inc. ("V. Plastics"), the manufacturer of the defectively designed, manufactured, and warned polybutylene pipe, judgment-proof and to avoid liability to Plaintiff and the class. Plaintiff would show the Court as follows:

I.   JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction over this case pursuant to 19 U.S.C. §1964(c), 28 U.S.C. §1332 (federal question) and 28 U.S.C. §1367 (ancillary jurisdiction).

2.   Venue is proper in this district pursuant to 28 U.S.C. §1391(b) as the Vanguard Entity Defendants and the Viega Entity Defendants reside in this district and events giving rise to Plaintiff's claims occurred in this district.   The Class received the defective water pipes that were

1

designed, manufactured, advertised, sold and/or warranted from McPherson County, Kansas.

3.      Venue is also proper in this district pursuant to 18 U.S.C. §1965 as the Viega Entity

Defendants and the Vanguard Entity Defendants reside in, are found in, and transact their affairs in

this district.

II.      THE PARTIES

4.      Named Plaintiff. Margaret T. Givens is a citizen and resident of Alabama.   Ms.

Givens' claim does not exceed $75,000, exclusive of interest and costs, and believes that all class

members have damages of less than $75,000 exclusive of interest and costs.

5.      The Vanguard Entity Defendants.

a.      Vanguard Plastics, Inc. ("V. Plastics") is an active Kansas corporation with

its principal place of business in McPherson, Kansas.   V. Plastics was involved in the original

design, manufacture, advertising, sale, warranting, and claims handling of PB pipe.   Its resident

agent is Vanguard Plastics, Inc., 831 North Vanguard Street, McPherson, Kansas 67460, where it

may be served with process.

b.      Vanguard Piping Systems, Inc. was a Kansas corporation created in

1995 from the assets and cash of V. Plastics and, using the corporate opportunities, officers,

directors, and employees of V. Plastics, continued the flexible piping business of V. Plastics.

During its existence, its principal place of business was McPherson, Kansas.   On January 1,

2007, Vanguard Piping Systems, Inc. was merged out of existence into VG Pipe, L.L.C.   The

resident agent for Vanguard Piping Systems, Inc. is listed on the Kansas Secretary of State's

website as William H. Seiler, Jr., 901 North Vanguard Street, McPherson, Kansas 67460.

c.      Vanguard Industries, Inc. is an active Kansas corporation which serves

as a holding company for the Vanguard entities and conducts no other business.   Its principal

place of business is McPherson, Kansas.   Like Vanguard Piping Systems, Inc., it too was

2

created in 1995 out of the assets and cash of V. Plastics.   Its resident agent for service of process is William H. Seiler, Jr., 831 North Vanguard Street, McPherson, Kansas 67460.

        d.      Vanguard Industries, Inc. and Vanguard Piping Systems, Inc. are responsible for the liabilities associated with M pipe as a result of successor liability and/or as a result of fraudulent transfer from V. Plastics to them as well as other legal and equitable theories.

        e.      All the Vanguard entities, directly or indirectly, are commonly owned, Kansas corporations, and operated principally from the Vanguard facility in McPherson, Kansas, and are collectively referred to as "Vanguard" or "Vanguard Defendants".

      6.     The Mitsui Entity Defendants

        a.      Mitsui Petro Chemical Ltd. is believed to be a Japanese company that during the relevant times conducted substantial, continuous, and on-going business in Kansas with the Vanguard Defendants.   It is not authorized to do business in Kansas, but did so anyway. It can be served by serving Mitsui Plastics, Inc. via its President at 11 Martine Ave., Suite 1175, White Plains, NY 10606.

        b.      Mitsui Plastics, Inc. also continuously did business in Kansas with the Vanguard Defendants, but was not authorized to do business in the State of Kansas. According to its website, Mitsui Plastics, Inc. was created in 1988 as a subsidiary of Mitsui & Co., Ltd. and Mitsui & Co. (USA), Inc. to serve the U.S. plastics market with its headquarters in White Plains, NY.   http://www.mitsuiplastics.com/about.php   Mitsui Plastics, Inc. can be served by serving its President at 11 Martine Ave., Suite 1175, White Plains, NY 10606.

        c.      Mitsui & Co. (USA), Inc. shows that it is a subsidiary of Mitsui & Co., Ltd. (Japan) incorporated in New York in 1966 with headquarters in New York City and can be served by serving its President, Masaaki Fujita, at 200 Park Ave., New York, NY 10166.

      d.    <u>Mitsui Petrochemical Industries, Ltd. (a/k/a Mitsui Sekka)</u> is a Japanese company formed in 1955 and eventually formed numerous joint ventures, including one with Shell for the production of PB resin.  [http://www.fundinguniverse.com/company-histories/Mitsui-Petrochemical-Industries-Ltd-Company-History.html](http://www.fundinguniverse.com/company-histories/Mitsui-Petrochemical-Industries-Ltd-Company-History.html)  Mitsui Sekka can be served by serving Mitsui Plastics, Inc. through its President at 11 Martine Ave., Suite 1175, White Plains, NY 10606.

      e.    All the Mitsui entities, directly or indirectly, are commonly owned and operated, and are collectively referred to as "Mitsui or Mitsui Defendants".

    7.    <u>The Viega Entity Defendants</u>

      a.    <u>Viega, Inc.</u> is a Delaware corporation formed in Kansas on April 15, 2009 and owns 3 subsidiaries: Vanguard Industries, Inc.; Viega LLC; and Midtec, Inc. of America. Viega, Inc. is a holding company and conducts no business directly.  Viega, Inc. can be served by serving its registered agent The Corporation Company, Inc., 515 S. Kansas Avenue, Topeka, KS 66603.

      b.    <u>Viega LLC</u> is a Delaware limited liability company formed in Kansas on September 25, 2006 and is the operational business for flexible polybutylene systems (including piping and fittings) in the United States.  It has a 62.41% investment interest in Viega NA LLC. Vanguard Industries, Inc., a co-defendant, holds a 20.49% interest in Viega NA LLC.  Viega LLC can be served by serving its resident agent The Corporation Company, Inc., 515 S. Kansas Avenue, Topeka, KS 66603.

      c.    <u>Midtec, Inc. of America</u> is a Kansas corporation formed on April 16, 1980, and conducts no business of its own.  It currently only holds an investment interest of 17.08% in Viega NA LLC.  Formerly it made fittings for polybutylene and other flexible piping systems sold

by the Vanguard Defendants.   It can be served by serving its registered agent Midtec, Inc. of America, 924 W. 1st, McPherson, KS 67460.

d.      Viega NA, LLC is owned entirely by three entities doing business in Kansas, but Viega NA, LLC is not authorized to do business in Kansas.   It can be served by serving its President, who is also the President of all of the Viega related entities, Dan Schimerer at 301 N. Main, 9th Floor, Wichita, KS 67202.   Viega NA, LLC also does not conduct any business of its own, but instead holds 100% investment interest in Midtec, LLC and in VG Pipe, LLC, both of which are active corporations in Kansas.

e.      Midtec, LLC is a Delaware limited liability company formed in Kansas on April 15, 2009, and can be served by serving its resident agent The Corporation Company, 515 S. Kansas Avenue, Topeka, KS 66603.   Midtec, LLC does not operate any business of its own, but holds the old unused physical assets of Midtec, Inc. of America.

f.      VG Pipe, LLC is a Delaware limited liability company and the successor by merger with co-defendant Vanguard Piping Systems, Inc.   VG Pipe, LLC can be served by serving The Corporation Company, Inc., 515 S. Kansas Avenue, Topeka, KS 66603.   VG Pipe, LLC does not conduct any business of its own but holds some of the old and unused physical assets of Vanguard Piping Systems, Inc.

g.   All the Viega entities, directly or indirectly, are commonly owned and operated, and are collectively referred to as "Viega" or "Viega Defendants".

8.      Unnamed Co-Conspirators: Vanguard Shareholders and Officers.   Before their sale to Viega, Inc., and at all material times, the same shareholders owned V. Plastics and Vanguard Industries, Inc. in the same proportions, and indirectly Vanguard Piping Systems, Inc.

a.      The voting shareholders of the Vanguard entities were:

i)      The Swinehart family

5

a)  Keith  Swinehart II was a $1/3^{rd}$ shareholder in Midtec, Inc. of America. Keith Swinehart II was the vice chairman and CEO of Vanguard Industries and Vanguard Piping Systems and on the board of directors of Vanguard Industries, Vanguard Piping, Vanguard Plastics, and Midtec, Inc. of America.  Keith Swinehart II was also a director and chairman of the board of Vanguard Piping Systems (Canada), Inc.

b)  Dinah Swinehart was also a $1/3^{rd}$ shareholder in Midtec, Inc. of America.  Dinah Swinehart was the secretary of Vanguard Industries, vice president and secretary of Vanguard Piping, secretary/treasurer of Midtec, Inc. of America and on the board of directors of Vanguard Industries and Midtec, Inc., of America.

c)  Keith Swinehart, Sr. was the chairman of the board of Vanguard Industries and Vanguard Piping Systems and on the board of directors of Vanguard Piping Systems.

ii)     S.H. Leggitt Co. was a large shareholder of the Vanguard entities and is currently in bankruptcy.

iii)     The Leggitt Family: Don Leggitt, Sr. and Don Leggitt, Jr.

a)     Don C. Leggitt, Sr. was on the board of directors of Vanguard Industries and Vanguard Piping as well as on the board of directors for Midtec, Inc. of America and was Vice President of Vanguard Piping Systems, Inc.

b)     Don C. Leggitt, Jr. was on the board of directors of Vanguard Industries and Vanguard Piping.

9.     These voting shareholders, directors, and officers of the Vanguard Defendants conspired with the Viega Defendants to loot V. Plastics through a series of corporate shell transactions.  Each of them individually and together authorized or ratified the fraudulent transfer of assets away from V. Plastics and to newly created Vanguard entities to shield those assets from

claims of future creditors, including the class members in this case, and to preserve their control over those assets for their individual and collective financial benefit. They took these actions knowing that many states had banned usage of PB pipe in potable water plumbing, knowing that V. Plastics had outstanding and ongoing warranty obligations for defective product, knowing that PB pipe had failed, was failing and was likely to fail in the future but refusing to recall M pipe, knowing that V. Plastics was without insurance to cover any such claims despite its contractual obligation with Mitsui to obtain such insurance, and intending to leave V. Plastics essentially judgment proof.

10.     In the stock purchase agreement, and related agreements, the Vanguard shareholders individually, and jointly and severally agreed to indemnify all of the Viega Defendants for any liabilities arising out of the polybutylene business such as this case.

## **FACTUAL BACKGROUND**

11.     Polybutylene (PB) is a plastic resin that was used extensively in the manufacture of water supply piping from the early 1970's until the mid 1990's. Defendant Vanguard Plastics, Inc. and others developed, engineered, and marketed PB pipes as a cost-effective but equally durable alternative to copper piping for ordinary household ("potable") water plumbing systems in residences and other structures.

12.     Although PB pipe was new and untested, Vanguard, and other manufacturers of PB pipe, affirmatively represented, both publicly and privately, and advertised PB pipe as: 1) being better than copper piping for potable water; 2) suitable for use in domestic potable water systems; and 3) reliable and having a long useful life. None of these representations were ever proven or known to be true, yet Vanguard sold PB piping systems anyway, and later by the mid-1990s, knowing there was substantial evidence that PB pipe was not better, suitable, or long lived in potable water, continued to sell the PB piping systems.

13.     In the 1980s, Vanguard, and others, made express representations to various public entities and public bodies to gain building code approval of PB pipe for residential use. While initial testing was promising, after a few years PB pipe was a disaster, as an unusually high failure rate accompanied PB pipe.

14.     In the 1980's, reports of polybutylene pipe cracking and leaking appeared. Investigation revealed that ultraviolet radiation from sunlight and oxygen and chlorine in the water supply reacted with the butylenes polymer making the pipe brittle and subject to leaks and ultimately causing failure of the pipe.

15.     By the late 1980's, polybutylene pipe systems were suffering leaks at unacceptable levels. Extensive litigation concerning the PB pipe systems ensued.   The litigation revealed two types of PB pipe: pipe manufactured with resin produced by Shell Oil Company d/b/a/ Shell Chemical Company ("Shell"); or pipe manufactured with resin produced by Mitsui Plastics, Inc. ("Mitsui"), a Japanese company.

16.     Initially, Shell and Mitsui developed PB resin together with Shell being the only U.S. seller of PB resin until 1992 when Mitsui became the exclusive seller of PB resin to V. Plastics.

17.     Shell Pipe.   In the 1980s, Shell Oil Company d/b/a Shell Chemical Company ("Shell") was the only seller of PB resin in the U.S. market.   It sold the resin to various plumbing pipe manufacturers, including V. Plastics.   In numerous lawsuits, plaintiffs and their experts alleged against Shell and V. Plastics that PB resin would oxidate, become brittle, and crack when exposed to chlorinated potable hot water.   Shell and V. Plastics blamed the manufacturers of the acetal fittings used with PB pipe, E.I. DuPont de Nemours ("DuPont") and Hoechst Celanese Corporation ("Hoechst").   Ultimately, the class action litigation over the acetal fittings was settled for $120 million, Spencer v. DuPont, Case No. 94-074, Greene County Circuit Court, Alabama,

8

and the litigation over PB pipe manufactured with Shell resin was settled for $950 million. Cox v. Shell Oil, et al., Case No. 18,844, Obion County Chancery Court, Union City, Tennessee.   As a result of these nationwide class settlements, everyone with PB plumbing systems made from Shell resin (including pipe made by Vanguard) was provided a remedy of a replumb of their house and/or reimbursement of out-of-pocket expenses when qualified leaks occurred.   Owners of Vanguard pipe with Mitsui Plastics Incorporated resin were excluded from these settlements. This case is on behalf of those excluded from the *Spencer* and *Cox* settlements who reside in the United States with the exception of those who own residential real property or structures in the States of Kansas, Oklahoma, Georgia and South Carolina.[1] The acetal fitting resin manufacturers, Hoechst and DuPont, have not been sued in this case because by the time Vanguard sold the "M" pipe, acetal resin fittings had not been offered for sale or used for installation for years.

18.     From this litigation and other sources, Shell and V. Plastics knew in the late 1980s that: (a) PB pipe studies of low concentrations of chlorine could adversely affect the oxidative resistance of PB resin (and the higher the concentration of chlorine the greater the adverse effect); (b) potable water was usually chlorinated; (c) the adverse affects were exacerbated with higher temperatures; (d) potable water was hot in residential settings; and (e) PB pipe was intended and marketed for the useful life of a home, over 25 years (which Vanguard set as the term of its express warranty).

19.     Also, as knowledge of problems with PB pipe spread, many states and cities, as well as the Uniform Plumbing Code, began in the early 1990s to bar use of PB pipe in residential

---

[1]    Owners of Vanguard pipe with Mitsui Plastics Incorporated resin who reside in Kansas, Oklahoma, Georgia and South Carolina are pursuing their claims in *Dragon v. Vanguard Plastics, Inc., et al.,* Case No. 01-C-98, Dist. Ct., McPherson Co., Kansas. (Lively, J.)

construction.

20.     Outside the litigation, Shell barred the use of PB resin in hot recirculating pipe in 1989.   Thereafter, in the 1990s, Shell created a multi-million dollar testing lab to evaluate the chlorine oxidation complaints in potable hot and cold water PB piping.   In the meantime, Shell continued to sell PB resin to V. Plastics which continued to manufacture, tout, market, and sell PB pipe as merchantable for potable water systems containing chlorine.   In 1993, based on its testing, Shell advised V. Plastics (and other PB pipe manufacturers) that chlorine adversely affected potable water PB piping. The next year, Shell advised V. Plastics to stop selling PB pipe for potable water where chlorination exceeds 2 parts per million and cautioned that its chlorine testing was on-going and the results may change over time.   Confidentially, Shell informed V. Plastics that it may stop selling PB resin altogether.

21.     In response to Shell's warning in 1989, V. Plastics discontinued recommending PB pipe for use in chlorinated potable hot water systems but it continued to manufacture and sell PB pipe.

22.     While Mitsui agreed to steer clear of the U.S. market for years, by the 1990s, it ended that pact with Shell, and solicited business from V. Plastics to sell PB resin in the U.S.   In 1992, V. Plastics and Mitsui Plastics, Inc. entered into an agreement for Mitsui Petrochemical Industries, Ltd. (a/k/a Mitsui Sekka) to produce PB resin and sell it through Mitsui Plastics, Inc. to V. Plastics for use in potable water plumbing pipe, "M" pipe.   V. Plastics continued to purchase PB resin from Shell as well.

23.     From mid-1992 to the end of 1993, Mitsui supplied V. Plastics with PB resin for use in manufacturing its PB pipe for residential plumbing use.   V. Plastics labeled that pipe, "PB2110M", with the "M" designating the pipe was manufactured with Mitsui resin ("M" pipe).

24.     Aware of the U.S. *Spencer* and *Cox* litigation, however, Mitsui demanded V.

Plastics agree to indemnify Mitsui from claims. Mitsui also required V. Plastics to maintain insurance to cover any product failures, claims, or litigation concerning the PB pipe. Despite its agreement with Mitsui, V. Plastics never obtained the insurance. Indeed, V. Plastics had not had insurance coverage for PB pipe since 1989. In 1993, Mitsui stopped selling PB resin to V. Plastics for potable water piping.

25. But from 1992 to 1993, Vanguard had the exclusive U.S. right to produce "M" pipe and sold such "M" pipe along with Shell PB pipe, to various retailers and plumbers throughout the United States, knowing and expecting such "M" pipe to be used in residential manufactured and site built homes through the ordinary chain of distribution. Sometimes wholesalers would purchase PB pipe from Vanguard and have it drop shipped directly to the location where it was to be installed. Substantial quantities of PB pipe (undifferentiated between Shell resin and Mitsui resin, both designed and manufactured by Vanguard) were sold by Vanguard in wholesalers throughout the United States in for installation in residential construction. The PB pipe sold into those states remained in those states and was not distributed elsewhere.

26. In response to Shell's warning in 1994 to stop selling PB pipe for potable water systems where chlorine exceeds 2 parts per million, V. Plastics revised its product catalogs to provide warnings about the use of PB pipe in potable water systems and attached hang tags to the outside coil of PB pipe (no warnings were embossed directly on the pipe itself), but it continued to sell PB pipe until its inventory was depleted in 1995. Due to the natural turnover of inventory for Vanguard, as well as those in the distribution chain of "M" pipe, virtually all of the "M" pipe for potable residential use was exhausted from inventory and distributed by the end of 1995.

27. Also in 1995, V. Plastics created two new "Vanguard" companies, Vanguard Industries, Inc. and Vanguard Piping Systems, Inc. Vanguard Industries, Inc. is a holding company for various Vanguard entities, including V. Plastics, which is a wholly owned subsidiary.

Vanguard Piping Systems, Inc., also a wholly owned subsidiary of Vanguard Industries, Inc., in

1995.

28.     As more fully explained below, these entities were formed to try to jettison V.

Plastics' valuable assets (real estate, equipment, non-PB inventory, customer lists, labor,

management, intellectual property, and cash) to Vanguard Industries, Inc. and Vanguard Piping

Systems, Inc., leaving V. Plastics a shell company.   This was done in an obvious effort to leave the

liabilities (and those who were owed warranties, express or implied) with nothing and to keep all of

the assets for the V. Plastics' shareholders, who were set up as the shareholders of V. Industries (and

indirectly V. Piping).

II.     THE CLASS

29.     Unbeknownst to Ms. Givens when she purchased her home in 1997, the builder had

plumbed the dwelling with PB pipe manufactured by Vanguard, which was manufactured with

Mitsui resin. This "M" pipe has proved defective and has leaked.   The defective pipe caused Ms.

Givens to replumb her entire house in September 2008.

30.     The Class. Plaintiff Givens brings this class action on behalf of the following:

All persons and entities that own residential real property or structures in the United States
in which Vanguard polybutylene plumbing containing resin manufactured by Mitsui Plastics
Inc. (a/k/a "M" pipe) was installed from July 1, 1992 - December 21, 1995.

Excluded from the Class are (1) claims for personal injury by the Class Members; (2)
Defendants, and any parent, subsidiary, affiliate, or controlled person of any Defendants, the
officers, directors, agents, servants, or employees of the Defendants, and the members of the
immediate families of any such person; (3) any class member who recovers under the
existing *Dragon v. Vanguard entities* class action.

31.     The Class received the defective and unmerchantable "M" pipe designed,

manufactured, advertised, and/or sold by V. Plastics.

32.     The "M" pipe was installed in Plaintiff's and the Class' structures and has failed, is

failing or will fail by degrading, cracking, leaking, and spraying water, causing or likely to cause

substantial damages to the property owned by Plaintiff and the Class.

33.     Plaintiff and the Class who have not yet had leaks have been damaged and will continue to be damaged by having to replace all of the PB pipe in the structures owned by them, pay more for insurance on their structures, and reduced property value.

34.     Fraudulent Concealment of Latent Defects.   The defects in the PB pipe complained of herein are latent and self-concealing, and through the exercise of reasonable care, Plaintiff and the Class could not have determined such defects existed. Defendants are responsible for causing the defects, whether by design or manufacture.   As a result, Plaintiffs and the Class should have any statute of limitations tolled pursuant to the discovery rule.

III.     CLASS ACTION ALLEGATIONS

A.     Class Definition

35.     Plaintiff Margaret T. Givens bring this class action pursuant to K.S.A. 60-223 on behalf of a Class as follows:

> All persons and entities that own residential real property or structures in the United States in which Vanguard polybutylene plumbing containing resin manufactured by Mitsui Plastics Inc. (a/k/a "M" pipe) was installed from July 1, 1992 - December 21, 1995.

> Excluded from the Class are (1) claims for personal injury by the Class Members; (2) Defendants, and any parent, subsidiary, affiliate, or controlled person of any Defendants, the officers, directors, agents, servants, or employees of the Defendants, and the members of the immediate families of any such person; (3) any class member who recovers under the existing *Dragon v. Vanguard entities* class action.

B.     Class Certification Factors.

36.     Plaintiff brings this action individually and as representative of the above-mentioned Class.

37.     Numerosity, K.S.A. 60-223fa)(T): Plaintiff does not have access to the information necessary to establish the names or total number of Class members. Several hundred class members exist in Alabama alone. The records of Defendants and their wholesale customers will

13

contain more detailed information. However, Plaintiff believes that the size of the Class numbers in the thousands and is so numerous that joinder of individual members is impracticable.

38. Commonality, K.S.A. 60-223(a)(2): Plaintiff's claims have common questions of law or fact, including:

        a.  When did the statute of limitation accrue under the discovery rule?

        b.  Was the statute of limitations tolled?

        c.  Was V. Plastics, Inc. a "merchant" of "M" pipe?

        d.  Was "M" pipe unmerchantable when sold by V. Plastics?

        e.  Did V. Plastics, Inc. act knowingly or recklessly in marketing "M" pipe after the Shell PB pipe problems and the plumbing code denials?

        f.  Did the "M" pipe breach the express warranty?

        g.  Did the "M" pipe violate the consumer protection act?

        h.  How much damage is done to the value of a home by having "M" pipe?

        i.  Are Vanguard Industries, Inc. and Vanguard Piping Systems, Inc. liable either as successors in interest for the design and manufacturing done by Vanguard Piping, Inc. or for fraudulent transfers to them?

        j.  Did the Vanguard Defendants and Viega Defendants conspire to loot V. Plastics of assets and to leave V. Plastics judgment proof?

39. Typicality, K.S.A. 60-223(a)(3): Plaintiff's claims are typical of the claims of the Class.

40. Adequacy of Representation, K.S.A. 60-223(a)(4): Plaintiff, as an owner of residential real property containing M pipe which leaked and required replumbing of her entire residence, can and will fairly and adequately protect the interests of all Class members.

41. Plaintiff's counsel have been and are currently involved in class action litigation,

have extensively researched the factual and legal issues involved herein, and can competently represent the entire Class.   Plaintiff's counsel are Class Counsel in *Dragon v. Vanguard Plastics, Inc., et al.,* Case No. 01-C-98, Dist. Ct., McPherson Co., Kansas, which is a certified class action on behalf of owners of residential real property or structures in Kansas, Oklahoma, Georgia and South Carolina against the Vanguard Defendants in this action.   Accordingly, Plaintiff's counsel in this case is familiar with the facts and claims asserted in that case and can adequately represent Plaintiff and the Class in this case.

42.    A Class Action Is Superior, K.S.A. 60-223(b)(3): A class action is superior to any other available method for the fair and efficient adjudication of the controversy involving homeowners in different States. A single adjudication of this dispute in a class action will prevent incompatible court determinations, prejudicing Plaintiff and taxing judicial resources. One single decision in this class action would be dispositive of the interests of the members of the Class and would thereby protect those interests better than separate actions.

43.    Common Issues Predominate, K.S.A. 60-223(b)(3): Questions of law and fact common to all members of the Plaintiff class predominate over other questions, if any, affecting only individual members.

44.    A Class Action Will Aid In Case Management, K.S.A. 60-223(b)(3): Deciding this issue as a class action would save time and expense for the parties and the Court, instead of this Court being inundated with hundreds of individual lawsuits.

IV.    LEGAL THEORIES/CAUSES OF ACTION.

The Defendants are liable to the Plaintiff and each and every member of the Class based upon the following theories:

### Count I.    Implied Warranty of Merchantability

45.    Kansas substantive law applies to products emanating from and claims made to

Kansas. Defendants were at all material times merchants with respect to the "M" pipe sold (or

successors in interest thereto).   Defendants warranted the "M" pipe as fit for the ordinary purpose

for which such water piping is used, including lasting for the useful life under expected conditions.

However, due to latent defects, known to Mitsui and Vanguard, the "M" pipe was and is not fit for

the ordinary purpose of transporting potable water over time for the expected useful life of the pipe.

As a result, Plaintiff class members have been deprived of their benefit of the bargain expected

upon installation of the "M" pipe.   The "M" pipe was defective when it left Defendants' control.

Plaintiff and the class members were damaged as a direct and proximate result.

### Count II.   Breach of Express Warranty

46.      Kansas substantive law applies to the express warranties made and issued from

Kansas.   Defendants gave express warranties, expecting and intending that such express warranties

could be enforced by the ultimate user, and have in fact paid claims made on the express warranty

over the years by residential consumers of PB pipe. Defendants have made no extensive effort to

determine the location of all "M" pipe, and have not provided class members any information about

the defective "M" pipe in question. Defendants, having knowledge of the problems with "M" pipe,

have waived any rights or should be equitably estopped as to any rights governing the repair or

replacement of such "M" pipe, and to the extent Defendants still wish to honor their express

warranties, the Plaintiff Class members hereby tender to Defendants the opportunity to repair or

replace the "M" pipe.   Defendants have refused this opportunity, claiming that the "M" pipe is not

defective or in need of repair until after it leaks (which Plaintiff now knows the hard way is

inevitable). However, Defendants are well aware that such "M" pipe is no longer acceptable under

applicable building codes, cannot be partially repaired, extended, or worked upon without

completely replacing the "M" pipe to comply with existing building and plumbing codes; and still

have not offered to repair or replace the "M" pipe under the express warranty. Plaintiff Class

members were damaged as a direct and proximate result.

## Count III.   Consumer Protection Acts

47.     Kansas substantive law applies (and to the extent the law of each state does, they are common to that of Kansas substantive law). Plaintiffs and the Class are consumers of and Defendants are suppliers of "M" pipe. The sale of "M" pipe under the circumstances was a deceptive act or practice.   Defendants represented that "M" pipe had the characteristics of and could be used for plumbing pipe for the expected useful life, but the "M" pipe does not and did not have those characteristics at the time the "M" pipe was sold.   Defendants knew or had reason to know that PB pipe was defective, was not supported by the building codes, would leak, would cause damage to the residential real property and structures into which it was installed, and would not last for the useful life of non-defective plumbing systems.   Defendants' conduct was done knowingly (or Defendants had reason to know) of the falsity of the representations made. The misrepresentations had and will continue to have an adverse impact on the public for years to come and Defendants have done nothing subsequent to the sale to warn or mitigate the adverse impact for "M" pipe owners even though Defendants' Shell pipe owners long ago had the opportunity for a remedy and still do as a result of the class action settlement.   Plaintiff Class members were aggrieved and damaged as a direct and proximate result.

## Count IV. Successor In Interest

48.     The Viega entities purchased the Vanguard entities (except conveniently V. Plastics' PB liabilities) in order to continue the flexible piping business of the Vanguard entities which was originally the business of V. Plastics.   Vanguard customers became the customers of the Viega entities.   V. Industries and V. Piping Systems also were the successors in interest to V. Plastics in order to continue the flexible piping business (except conveniently V. Plastics' PB liabilities).   Indeed, it is this convenient carve out that also was the essence of the transactions that

17

were used to fraudulently escape liability for the debts of V. Plastics. V. Industries and V. Piping Systems inherited the customers of V. Plastics which is not surprising since the salesmen remained the same from V. Plastics to the other Vanguard entities.

Count V.   Fraudulent Transfer

49.      The transfers from V. Plastics to V. Industries and V. Piping were to insiders; indeed, from the V. Plastics shareholders to the same shareholders in V. Industries and V. Piping. V. Plastics (and its shareholders, officers, and directors who were the same for V. Industries and V. Piping) retained control of the flexible piping business.   The transfer of the assets was disclosed in part and concealed in part so that employees and customers noticed no difference.   V. Plastics had been sued many times, had ongoing lawsuits at the time of the transfers, and was threatened with many other lawsuits.   Over time, substantially all of V. Plastics' assets were transferred.   V. Plastics actively sought ways to extract the valuable assets for the benefit of its shareholders while leaving the liabilities behind for those using and holding warranties for the defective plumbing systems sold by V. Plastics.   That was accomplished in the sale of the old V. Plastics assets and corporate opportunities to Viega.   During the transfer process, the assets were initially transferred out of V. Plastics at book value, and once laundered through V. Industries and V. Piping, resold to Viega at fair market value netting the V. Plastics shareholders literally millions of dollars.   Shortly after the transfer of assets, V. Plastics was insolvent and remains so to this day.   The extent of that insolvency was never quantified because the accountants could not even value the extent of the PB liabilities, including this case and others.

Count VI.   Conspiracy

50.      The Mitsui Defendants agreed with V. Plastics to sell Mitsui PB resin in PB pipe across the country for residential plumbing for use in ordinary hot and cold water without knowing that such products were safe for its intended useful life. Mitsui and Vanguard travelled

internationally to facilitate this conspiracy and committed numerous overt acts in the selling of Mitsui resin made in Japan, shipped to the United States, made into PB pipe, and advertised, promoted, and sold throughout the U.S. proximately causing damage to Plaintiff and the Class.

51.     V. Plastics and the other Defendants (except Mitsui) conspired together in a meeting of the minds to accomplish the fraudulent transfer of assets away from V. Plastics to other entities to knowingly and intentionally leave Plaintiff and the class members, the owners of residential real property and structures in which "M" pipe was installed, holding the bag for the actual or eventual failure of "M" pipe.   Defendants overtly acted in furtherance of the conspiracy by creating new entities, continuing to sell and purchase Mitsui resin for incorporation into "M" pipe with knowledge of its defect, failing to provide insurance for claims resulting from the failure of "M" pipe, failing to recall the "M" pipe, structuring sales of assets and leaving the liabilities in V. Plastics, cutting out V. Plastics from the sale of the Vanguard entities to the Viega entities, Plaintiff and the class members were damaged as a proximate result of the Defendants' conspiracy.

Count VII.   Constructive Trust

52.     A constructive trust over the $4.5 million escrow should be established to prevent its dissipation or distribution as it represents V. Plastics money to partially satisfy the potential judgment in this case and it would unjust enrich the V. Plastics stockholders to obtain payment and potentially put the money out of reach to the Class of consumers V. Plastics harmed.   A "confidential relationship" was created between the Class and V. Plastics through advertising and warranties, and distribution of the escrow money (as well as the V. Plastics money distributed by and through V. Industries and V. Piping to the same shareholders) would violate that confidential relationship.   *See Estate of Draper v. Bank of America*, *N.A*., 288 Kan. 510, 519, 205 P.3d 698 (2009).

## Count VIII.   Receivership

53.     At this time, Bill Seiler is the Shareholder Representative who has total control over the $4.5 million escrow account.   He is the Shareholder Representative for the current V. Plastics shareholders.   He is also in-house General Counsel and an officer of V. Plastics with duties to the company not just shareholders, in-house counsel for Viega, Inc. and perhaps other Viega or other Vanguard entities (directly or indirectly through Viega, Inc.), and it currently counsel in this case. He has various conflicts of interest that prevent him from administering the escrow and another receiver should be appointed to do so.   Mr. Seiler recognizes his predicament, and currently serves without bond.   A receiver should also be appointed without bond but subject to further orders of the Court. A bond is usually required when a business would have to shut down or be significantly altered by the appointment of a receiver, but V. Plastics was non-operational years ago. *See Jacobson-Lyons Stone Co. v. Silverdale Cut Stone Co*., 189 Kan. 511, 521, 370 P.2d 68 (1962) (allowing receiver without bond at request of non-shareholder).

## Count IX.   Joint Venturers

54.     The Vanguard companies all agreed to and did operate together to manufacture, market, and sell flexible plumbing piping systems.   The Vanguard entities had joint ownership and common control.   The Vanguard entities shared expenses, profits and losses, and the common officers and employees determined the allocation of assets and expenses annually which had the effect of dividing net earnings.   The Vanguard entities had the same officers, directors, and shareholders.   Employees did not even know which of the entities they worked for.

## Count X.   Injunctive Relief

55.     To obtain injunctive relief, a movant must establish: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant

outweighs whatever damage the proposed injunction may cause the opposing parties; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Rodriguez-Tocker v. Estate of Tocker*, 35 Kan.App.2d 15, Syl. 9, 129 P.3d 586 (2006).

56.     First, as shown above, there is no scientific evidence that the PB does not oxidize and deteriorate in chlorinated potable hot and cold water. The only question is when the PB pipe will fail, not if. *Rodriguez-Tocker* also states: "The establishment of a bona fide risk to the defendants' ability to pay a judgment satisfies the requirement that the movants establish a probable right to the injunctive relief sought and a probable danger of irreparable injury if that injunctive relief is not granted." *Id*. at Syl. 10.   Here, V. Plastics only has $4.5 million held in escrow to satisfy $16 million in damages in this case alone, not to mention the other 30 or more states into which V. Plastics sold the defective "M" pipe. Worse yet, the $4.5 million escrow may be distributed in October 2010.   It would be adverse to the public interest not to grant the injunction.

<u>Count XI.   Racketeer Influence and Corrupt Organizations Act ("RICO"),</u>

<u>18 U.S.C. §1961 et seq.</u>

Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1-56 as if fully restated herein.

57.     Defendants have engage in an ongoing pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

58.     The RICO pattern of racketeering activity engaged in by Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

59.     The acts of racketeering activity committed by Defendants have the same or similar methods of commission in that they all involved the knowing use of PB Mitsui resin for flexible

plumbing systems in residential settings while concealing from consumers that the polybutylene was untested for the useful life of the product in its ordinary use in ordinary household tap water, would deteriorate in ordinary chlorinated household water, and failed to warn or adequately warn of the breakdown in chlorinated water.

60. The acts of racketeering activity committed by Defendants have the same or similar objective: The sale of Mitsui resin for use in PB plumbing systems in residential homes so as to make Defendants money followed by the cover-up and concealment of the defects with the M pipe and the fraudulent transfers so Defendants could keep the money.

61. The acts of racketeering activity committed by Defendants have the same or similar victims, including the Plaintiff and other members of the Class.

62. The acts of racketeering activity committed by Defendants are otherwise related by distinguishing characteristics including, but not limited to, the involvement of Vanguard Plastics, Inc., Vanguard Piping Systems, Inc., Vanguard Industries, Inc., VG Piping, Viega, and the Mitsui entities, and other members of the association-in-fact enterprise.

63. Defendants' acts of racketeering activity involve a distinct threat of long-term racketeering activity and in fact have had a long term affect over more than a decade.

64. Defendants' practice of knowingly selling but concealing the defects of "M" pipe for years is ongoing at the present time and will continue into the future unless halted by judicial intervention.

65. Defendants knowingly sold defective M pipe, issued unduly restrictive warranties which were never provided directly to the consumer, utilized unfair claim practices to avoid paying for known defects, and transferred assets and money in an effort to make the Vanguard entities judgment proof and the Viega entities insulated from liability—all of which are illegal and will continue as part of its regular way of conducting business.

22

66.     Defendants conspiratorial conduct and public concealment of the defects of its use of "M" pipe was and is unlawful and false.

67.     Defendants share the common purpose of obtaining money and continuing to keep money for known defective products.   The enterprise has worked in this fashion continuously over the last 15 years.

68.     Defendants participate in the operation and management of the affairs of the enterprise which exists for Defendants benefit as well as other associated with Defendants.

69.     This association of Defendants constitutes an association-in-fact enterprise pursuant to 18 U.S.C. §1961(4).

70.     The enterprise affects interstate commerce in a variety of ways, not just in the previous shipping of defective plumbing systems, but in homes needing repair and replacement throughout the country, with goods shipped through interstate commerce to do so, claims made across state lines, increased cost of insurance for homes containing defective PB Mitsui pipe, and the wrongful refusal of claims and restriction of warranties across state lines, as well as the fraudulent transfer of assets, including money, across state lines.

71.     Defendants accepted and retained the benefits of the acts of racketeering activity, thereby ratifying the conduct of its officers, directors, and employees, and the members of the enterprise who assisted in committing those acts of racketeering activity.

72.     Defendants violated 18 U.S.C. §1961(1) by violating 18 U.S.C. §1341 because they devised a scheme or artifice to defraud or obtain money by means of false or fraudulent pretenses, representations, or promises, and held out "M" pipe as being something it was not and being useful in potable water for the useful life of plumbing in a residential home when it was not, and advertised such through the mails, including its product catalogues and also deposited the "M" pipe to be sent or delivered by a private or commercial interstate carrier and the facilitation of the

23

fraudulent transfer by the mails and by wire through the internet or otherwise.   The first enterprise involved Mitsui and Vanguard entities and the second enterprise involved the Vanguard entities and Viega entities.   The first enterprise was banded together for the purpose of selling "M" pipe and covering up its defects by a campaign of denials and obfuscation, as well as improper claims handling and warranties disclaiming practically everything, and the second enterprise was intent on making Vanguard Plastics, Inc. judgment proof, while attempting to place the liability only on Vanguard Plastics.   In other words, the first enterprise was conducted for the common purpose of making and keeping money and the second enterprise for the further common purpose of keeping it.

73.     Defendants' violations of RICO directly and proximately caused the damages to the Plaintiff and Class.

74.     Plaintiff and the Class have suffered an injury to their "property" as a result of Defendants violations of RICO.

75.     Defendants' unlawful conduct has allowed Defendants to earn or retain significant funds to which they are not entitled.

76.     The forgoing conduct constitutes a violation of 18 U.S.C. §1962(c).

77.     The Plaintiffs have been injured in their property by reason of and caused by Defendants violations of 18 U.S.C. §1962(c).

78.     Pursuant to 18 U.S.C. §1964(c), Plaintiffs in the class are entitled to recover three-fold the damages they have sustained and their costs of suit, including reasonable attorney's fees.

V.     PRAYER FOR RELIEF AND DEMAND

     Plaintiff prays for judgment and other relief as follows:

     a.     Certification of a class or classes pursuant FRCP 23;

b.      Judgment in an amount equal to three times the actual damages sustained by the

class, pursuant to 18 U.S.C. §1964(c), and in excess of $5 million dollars.

c.      Reasonable attorney's fees pursuant to 18 U.S.C. §1964(c).

VI.    <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury pursuant to K.S.A. 60-238 on all issues so triable.

VII.   <u>ATTORNEYS' LIEN CLAIMED</u>.

DATED: May 28, 2010.

Respectfully submitted,

/s/ Rex Sharp
Rex A. Sharp, KS #12350
Barbara C. Frankland, KS #14198
Gunderson, Sharp & Walke, LLP
5301 West 75th Street
Prairie Village, KS 66208
Telephone: 913/901-0505
Facsimile:  913/901-0419
rsharp@midwest-law.com
bfrankland@midwest-law.com

Isaac L. Diel #14376
Sharp McQueen, PA
Financial Plaza
6900 College Blvd., Ste. 285
Overland Park, KS 66211
Telephone: (913) 661-9931
Fax: (913) 661-9935
E-mail: idiel@sharpmcqueen.com

*Attorneys for Plaintiffs*

25